**F I L E D**
DISTRICT COURT
Custer County, Okla.

APR 1 2 2019

**STACI HUNTER**
*COURT CLERK*

**IN THE DISTRICT COURT OF CUSTER COUNTY**
**STATE OF OKLAHOMA**

KATHERINE HELDMANN,                    )
                                       )
          Plaintiff,                   )
                                       )
v.                                     )
                                       )        Case No. CV-2019- 37
SOUTHWESTERN OKLAHOMA STATE            )
UNIVERSITY COLLEGE OF PHARMACY,        )
a state educational institution,       )
DR. DAVID RALPH, individually,         )
DR. JAMES SOUTH, individually, and     )
DR. TIFFANY KESSLER, individually,     )
                                       )
          Defendants.                  )

## PETITION

COMES NOW the Plaintiff, Katherine Heldmann (Plaintiff) and hereby submits her petition in this matter. In support, plaintiff alleges:

1.     That Plaintiff was a third-year student at the Southwestern Oklahoma State University - College of Pharmacy (SWOSU).

2.     SWOSU is a state university and is a state actor under applicable law.

3.     SWOSU is a recipient of federal funding and required to comply with § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et. seq.*

4.     Defendants Dr. David Ralph (Dr. Ralph); Dr. James South (Dr. South) and Dr. Tiffany Kessler (Dr. Kessler) are employed with SWOSU and were decision makers to the unlawful conduct set forth herein.

5.     On May 7, 2018 Plaintiff was placed on academic suspension based upon certain disability related difficulties she began experiencing during the Fall semester of 2017 that continued into the Spring 2018 semester.

1

**Exhibit 2**

6.     Plaintiff notified SWOSU faculty in the fall of 2017 that she was struggling, faculty was dismissive of her attempts or otherwise failed to recognize what was clearly Plaintiff reaching out for help. However, Plaintiff was repeatedly told was that she could take a leave of absence.   The communications placed SWOSU with both actual and constructive notice of Plaintiff's condition an request and also imposed a duty of inquiry upon SWOSU as well.

7.     Plaintiff has been diagnosed with ADHD and Panic Disorder with symptoms of PTSD.

8.     Plaintiff was suspended after she formally disclosed her disability in violation of the Section 504 of the Rehabilitation Act (504) on the basis of a disability and further SWOSU has taken adverse action against Ms. Plaintiff by suspending her from the pharmacy school in retaliation for having pursued her rights under applicable law as a student with a disability.

9.     Dr. Kessler haphazardly denied Plaintiff's requested disability related accommodation.

10.     SWOSU applied its policies in an unlawful and draconian fashion in violation of the Rehabilitation Act.

11.     Plaintiff requested certain disability related accommodations pursuant to 504 for disability related difficulties she experienced the last two semesters.

12.     Plaintiff was a solid student before the exacerbation of her disabilities.

**Exhibit 2**

13.     Plaintiff had a close relationship with her grandfather, Donald Siler. During the Fall 2017 semester with her grandfather entered hospice care in Tulsa, OK.

14.     The news that her grandfather would soon pass away was devastating to Plaintiff and exacerbated her pre-existing condition.

15.     Ms. Plaintiff disclosed this information to all of her professors that this is something she would be dealing with that semester.

16.     Plaintiff had lived with and was able to reasonably function with her disabilities, her grandfather's declining health and imminent death was an exacerbating factor that limited her ability to manage her disabilities. Furthermore, the distance between Weatherford and Tulsa made it difficult for Plaintiff to spend as much time with her grandfather during his final days which further aggravated her panic disorder. Unable to adequately cope with the added stressors, Plaintiff's grades began to suffer.

17.     SWOSU faculty was aware that Plaintiff was struggling in the fall of 2017. This includes: Plaintiff met with faculty, including Dr. Kessler, throughout the semester expressing her concerns and the difficulties of school; Plaintiff advised Dr. Kessler that she was on Adderall and Xanax to help manage her stress. However, Plaintiff's struggles were always seemingly reduced to slipping grades based on family issues without any further consideration that Plaintiff's situation was more complex.

3

**Exhibit 2**

18.     The week of November 6, 2017, Plaintiff met with and requested Dr. Kessler to discuss moving the date of an exam so that she could travel to Tulsa to see her grandfather as he had taken a turn for the worse and did not have much longer to live.

19.     Dr. Kessler denied Plaintiff's request by responding that Ms. Plaintiff could visit her grandfather over the Thanksgiving break, which was two weeks later. Alas, on Friday, November 10, 2017 Plaintiff's grandfather passed away.

20.     When the 2017 fall semester concluded, Plaintiff had failed three (3) classes, despite having an otherwise solid academic record until this point. Plaintiff requested accommodations in the form of a withdraw due to the struggles she faced that semester, but her request was denied. Plaintiff was required to retake the three failed classes for the Spring semester.

21.     When Plaintiff began the Spring 2018 semester, her disability related struggles continued. Faculty was aware Plaintiff was struggling.

22.     However, the stress of the last year became too great for her to manage while she was sitting for her final examination in Pharmacy Care Lab V. Plaintiff experienced a debilitating panic attack that forced her to flee the examination room before she could complete the test. But for Plaintiff's panic attack which occurred during her final exam, she would have been able to finish the test and likely have passed the test.

23.     Due to Ms. Plaintiff's three failing grades from Fall 2017 and the one failed grade in Spring 2018, Ms. Plaintiff is now on academic suspension pursuant

**Exhibit 2**

to the College of Pharmacy Student Handbook, Pharmacy Suspension 14(E) which states: "A student who has a total of four course failure in at least two different courses shall be suspended."

24.    On May 7, 2018, Ms. Plaintiff was officially suspended from the SWOSU College of Pharmacy via letter from Dr. David Ralph.

25.    On May 11, 2018, after Plaintiff submitted documentation notifying administration of her intent to appeal, Plaintiff was contacted by Cindy Dougherty, Dean of Students, introducing herself as the individual who handles ADA disability accommodations for students at SWOSU.

26.    On May 16, 2018, Dean Dougherty notified Ms. Plaintiff that her disability had been officially and formally documented and that she would receive prospective accommodations. She further stated: "Accommodations are granted as long as they do not give you an academic advantage over others or allow cheating."

27.    On May 17, 2018, Dr. Kessler responded to Plaintiff's appeal request to retake her final exam for Pharmacy Care Lab V:

> "Hi Katie, I am responding to the letter to me that is imbedded in this document.
> Page 6 of the syllabus (attached) address the possibility to be excused from an examination due to **medical illness.** Accommodations have been made on prior exams for you due to illness **but you did not contact me prior to the final to notify me that you were** ill. Page 6 also covers that you **cannot leave an examination except due to an emergency.** From discussion with Dr. Stevens (the room proctor), you did not notify her of your panic attack. ADAAA information is on page 18 of the syllabus.

5

# Exhibit 2

> These policies are not applied retrospectively. You
> elected to take the examination at the scheduled time
> and did not notify anyone of the emergency during the
> exam so the grade will stand as is.
>
> The academic appeals process is also covered on page
> 18. As I have denied your request, your next step in the
> appeals process if you wish to continue it is to contact
> the department chair, Dr. Nancy Williams. I have cc'ed
> her on this email so that she knows what my response
> was."

28.     On May 21, 2018, Dean Dougherty entered medical withdraws for the
three (3) failed courses from the Fall 2017 semester.

29.     Despite entry of the hardship withdrawals for the three failed courses,
Plaintiff is still on academic suspension because the College of Pharmacy policy is
being strictly applied without full consideration of Ms. Plaintiff's request and
situation.

30.     That § 504 of the Rehabilitation Act in conjunction with the
Americans with Disabilities Act (ADA)  requires that when a university allows a
student to withdraw from courses based on medical necessity, the withdrawals
should have no effect on the student's GPA or academic status. If the pharmacy
school has a policy of ascribing a failing status when a student receives a well-
earned "W" grade due to documented disability-related issues, then the school has
an obligation pursuant to 504 of the Rehabilitation Act and the Americans with
Disabilities Act to facilitate a reasonable accommodation in the form of an academic
policy modification and/or exemption from any rules, that if applied strictly, would

**Exhibit 2**

penalize a student on the basis of her disability.

31.    Defendant SWOSU violated Section 504 by being unwilling to engage in a good faith interactive process to provide a reasonable accommodation; failing to provide a reasonable accommodation; thwarting the process and retaliate by failing to reasonably accommodate Plaintiff.

32.    Administrative withdrawals (based on documented medical necessity and/or disability-related functional limitations, **even when the student was not passing due to a disability-related issue,** ) is a routine form of ADA accommodation to help prevent academic failure on the basis of the student's disability-related functional limitations occurring during the time of class attendance. Further, even if the student made a request for a medical withdraw without penalty late in the semester, or beyond a no-penalty window of time, the ADA still requires that such policies be flexibly applied in consideration of circumstances surrounding the individual student making the request.

33.    Plaintiff requested that the withdrawals from the Fall Semester 2017 not be used to penalize her for having requested an accommodation.

34.    Plaintiff spoke with numerous faculty of the University that should have been able to refer her to the school's Disability Student Services (DSS) office the moment she disclosed experiencing "panic attacks" or anxiety in connection to any troubling personal matter. Indeed, Dr. Kessler, as a pharmacy professor, should have been able to recognize Plaintiff's need when Plaintiff disclosed to her she was taking Adderall and Xanax as those drugs are

7

**Exhibit 2**

prescribed for very specific purposes.

35.     University retaliated against Plaintiff under 504 by recommending that Plaintiff be suspended after making a request to modify or accommodate based on a disability when Dr. Ramos stated:

> "I am assuming that her rationale is to have these Ws not counted as the equivalent of course failures, which would then reduce the number of course failures and prevent her suspension. The leave of absence provides an opportunity for pharmacy students to withdraw with a W from all of the courses during a semester in which performance and learning are impacted by factors such as family issues, personal matters, financial strains, illness, etc. If the student elects to return the next semester, then the student is enrolled in all of the courses from the previous semester and then progresses from that point (graduation is delayed by one semester). The leave of absence requires a complete withdrawal from the College of Pharmacy (including surrendering of the intern license), but not the university. As a result, the student can receive just a plain W for every course during that semester regardless of the academic status. These Ws are not counted as the equivalent of course failures. However, some students are resistant to this option because it means the student will have to take the entire semester over again even if the student may be passing or doing reasonably well in some classes. This policy is explained to students during the orientation session when first enrolling in the program. We have had a number of students elect this option over the years and students have indicated that it was the right decision in order to allow the student to manage the negative factors and return with the ability to devote their energy and time to studying. Katie's request to have only the Ws from last semester count as "leave of absence Ws" is not consistent with the policy."
>
> Sorry for the long response. Hopefully, there can be a satisfactory outcome that is best for Katie, but also protecting the integrity of the program and the profession."

This was the May 11th 2018 response of Dr. Ramos.

39.     Ms. Plaintiff was experiencing panic attacks and anxiety caused by a diagnosed psychological disability. The deterioration of her grandfather's health

**Exhibit 2**

and his eventual passing was obviously the catalyst considering Plaintiff's solid academic record prior to the Fall 2017 semester. This fact was fully disclosed to all of Ms. Plaintiff's professors when the fall semester began. At the time, Plaintiff was unaware of civil rights laws that protect the right of students with disabilities. Even though she was unaware of those protections, a college student has no obligation to be familiar with any civil rights protection laws.

40.    Dr. Ramos' response completely overlooks the issue of Plaintiff's request for a disability related accommodation by "pigeon holing" students with disabilities in the same category as students with "family issues, personal matters, financial strains, illness, etc." None of Dr, Ramos' listed examples are comparable to a student with a disability. Indeed, comparing a disability to something like financial strain is quite insensitive and mischaracterizes Plaintiff's situation. Moreover, even other students with disabilities and/or students who do not disclose disabilities for purposes of requesting special considerations or academic adjustments should not be used to compare against Plaintiff's specific situation. Students with disclosed disabilities making a request for academic adjustments must be evaluated on an "individualized" basis pursuant to ADA/504 non-discrimination obligations. They cannot be compared in any way with other students.

41.    Furthermore, Plaintiff was only offered a leave of absence. A college or university is obligated to acknowledge and work with a student who makes a request for an accommodation or modification on the basis of a

**Exhibit 2**

disclosed disability. A student does not need to use "ADA" or "legal" language to request academic adjustments due to a disability. Simply making a request based on experiencing panic attacks, anxiety, and/or feeling depressed is enough to trigger the university's obligation to comply with applicable non-discrimination laws that protect the rights of students with disabilities. As such, Plaintiff was not required to accept a leave of absence as the only solution to her ADA request.

42.   Dr. Ramos' statement that Ms. Plaintiff outright rejected taking a medical leave, and as a consequence, the withdrawals from her Fall 2017 courses will be used to penalize her with "suspension" is inconsistent with ADA/504 obligations. This position ignores her status as a student with a disclosed disability making a request for academic adjustments or accommodations based on a disability-related functional limitation. "Lumping" her with any other student facing any personal issue is misguided and shows a lack of empathy with the real-world daily needs of individual students willing to openly ask for help. Certainly, offering "leave" as a possible accommodation should have been part of other possible adjustments that could have been made -- but "leave" could have never been the only available solution.

43.   Here, Dr. Ramos appears to misunderstand ADA/ 504 obligations to duly consider requested accommodations and/or academic adjustments when he insists that "suspension" is warranted as a penalty and/or disciplinary action based on Plaintiff's disability-related need to withdraw from courses. Given the circumstances herein, this

**Exhibit 2**

adverse action can easily be seen as "retaliation" in violation of the ADA and Section 504. Federal courts have repeatedly affirmed that retaliation is a violation of the Federal civil rights laws enforced by OCR. *Jackson v. Birmingham Board of Education,* 544 U.S. 167 (2005); *Peters v. Jennry,* 327 F.3d 307, 320- 21 (4th Cir. 2003); *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th Cir. 2002).

44. Again, standard operating procedures and/or academic policies may not be strictly applied in circumstances involving a disability-related request to withdraw from classes to avoid unduly penalizing a student who discloses that she is experiencing a mental crisis based on an emotional or psychiatric disorder. Hence, Dr. Ramos' insistence that "suspension" is the appropriate response effectively penalizes Ms. Plaintiff for having a disability-related need to request accommodations and/or academic modifications.

45. Dr. Ramos statement that "Katie's request to have only the Ws from last semester count as 'leave of absence Ws' is not consistent with the policy" is also at odds with the ADA and Section 504. *Id.* Ms. Plaintiff was not advised with regard to the possibility of requesting ADA/ 504 accommodations that might have included "leave" without penalty as a possible academic adjustment. While the "policy" of forcing "leave" on students facing personal issues that Dr. Ramos mentions may apply to students not disclosing a disability, the "policy" only applies to you insofar as making "medical leave" but one of the several possible accommodation alternatives that should have been discussed during an interactive meeting between Ms. Plaintiff, Dean Dougherty, Dr. Ramos and/or with the DSS office manager. Ms.

11

**Exhibit 2**

Plaintiff was never under any obligation to take a leave of absence as the "only" solution to her accommodation request that would have required highly specific and narrowly tailored appropriate accommodations.

46.     For instance, one arrangement could have consisted of allowing Ms. Plaintiff to use on- campus counseling services coupled with reasonable accommodations, including incomplete or withdrawal grades, without forcing her to take leave. This type of accommodation arrangement is routine in connection to students dealing with an emotional or psychiatric urgency. Readily available psychology research on students facing mental distress indicates an overall preference to keep students in school rather than forcing a leave of absence or suspension. However, Ms. Plaintiff was not aware of Dean Dougherty until she commenced this appeal process.

47.     Once involved in this situation, Dean Dougherty attempted to step in and rectify the situation when she recognized that Plaintiff's need to withdraw from the 2017 Fall classes was based on disability-related issues beyond Plaintiff's control, not mere personal issues. Granting the "W" neutral and/or non-impact grades for the three courses in Fall 2017 is an appropriate accommodation. Regrettably, the College of Pharmacy's unwillingness to recognize the withdrawals as  withdrawals based on a disability and insistence that Plaintiff be suspended is violative of basic ADA/504 principles. First, the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act, as amended in 2008 by the ADA

**Exhibit 2**

Amendments Act, apply evenly to faculty and administrators of an institution. Anyone acting on behalf of the school is liable under the ADA and Section 504.

48.     Neither the ADA nor Section 504 *obligate* Plaintiff, as a student, to use the services of a university's student disability services office. Voicing feelings of experiencing significant emotional and/or psychiatric distress directly to faculty while attempting to meet course requirements should have been recognized as a request for academic accommodations. This was Plaintiff's good faith effort to address academic obligations within the confines of a disabling condition. Indeed, Dean Dougherty expressly discusses and references Ms. Plaintiff's cries for help during the Fall 2017 semester. Both the faculty and the DSS office are continually obligated to listen for student disability- related request for help as a matter of Federal and State law legal obligation -- not as a matter of courtesy.

49.     The insistence that a leave of absence is the only form of accommodation that Ms. Plaintiff had available is the kind of misguided and discriminatory language the US Department of Justice and US Department of Education look for when determining "systemic" and pervasive discrimination against students with disabilities. Such suggests that students with disabilities such as Ms. Plaintiff are not welcome at the SWOSU school of pharmacy and either prefers students who either never disclose disabilities or simply do not experience significant emotional or psychiatric disabilities to begin with. Yet, as stated earlier, a "leave of absence" may not necessarily address the disability-

13

**Exhibit 2**

related needs of a student nor meet the school's ADA non-discrimination obligations.

50.     Such strict application of university policies indicates a lack of sensitivity toward the real-world needs of adult students who have the maturity to ask for help when it becomes necessary. Most post- secondary institutions recognize that student personal growth and professional development includes learning to ask for help when necessary. Indeed, I have no doubt that this is the kind of maturity pharmacy employers expect from new hires.

51.     Dr. Kessler's Refusal to Grant Ms. Heidmann an "I" (incomplete) Grade for the Pharm Care Lab V Class for the Spring 2018 Semester is Inconsistent with School Policy and Federal Law.

52.     At the outset, it must be reiterated that Dr. Kessler seems to have a fundamental misunderstanding of Plaintiff's situation. In her first denial to work with Plaintiff to accommodate, she characterizes Plaintiff's panic attack as a "medical illness." A medical illness is more akin to a stomach virus or the flu. A panic attack stemming from a diagnosed panic disorder is not the same thing. *See* Panic Attacks and Panic Disorder, Mayo Clinic, *available at* https: Furthermore, Dr. Kessler's claim that Plaintiff should have contacted her "prior to the final to notify me that you were ill" further demonstrates Dr. Kessler's confusion about what a panic attack even is.

14

**Exhibit 2**

"A panic attack is a sudden episode of intense fear that triggers severe physical reactions when there is no real danger or apparent cause." *See id.* Thus, how could Plaintiff have possibly been able to know she would suffer a panic attack during the exam to be able to notify Dr. Kessler? Her reasoning does not make sense. Finally, she concedes that a student is permitted to leave in the middle of an exam in the case of an emergency. Clearly, Plaintiff considered the episode an emergency as she was required to leave the room until her fear subsided. By the time she recovered, the test was over. Thus, she was unable to discuss anything with the proctor regarding what happened.

53.    On June 9, 2018, Ms. Plaintiff attempted to work with Dr. Kessler again when she requested and "I" or incomplete for the Pharm Care Lab V class so that she could retake the final exam. Indeed, this is an available option pursuant to university policy:

> An incomplete grade may be used at the instructor's discretion to indicate that additional work is necessary to complete a course. To receive an "I" grade, the student should have satisfactorily completed a substantial portion of the required coursework for the semester. The time limit to satisfy the "I" will be at the discretion of the instructor. "I" grades not changed by the instructor to a credit-bearing grade or an "F" within the specified time limit will remain as a permanent "I" and not contribute to the student's GPA.

> South Western Oklahoma State University, Graduate Studies, Grading System - Incomplete, *available at* http://www.swosu.edu/academics/ graduate-studies/gen-info/grading-system.aspx.

15

According to the SWOSU Faculty Handbook, Incomplete grades can be entered
as follows:

> In the case of instructor computation errors, errors in data entry,
> other errors by the instructor, and courses originally graded with an
> Incomplete (I), grades may be changed by the instructor in person
> in the Registrar's Office. An instructor may change a grade from one
> traditional grade to another (A, B, C, D, or F), or from an Incomplete
>
> (I) to any grade (A,B,C,D,F, or W). No review is required for this
> process.

South Western Oklahoma State University, Faculty Handbook, Grade Changes, p.
109, *available at* http://www.swosu.edu/facstaff/index.aspx.

However, Plaintiff's requested accommodation under this policy was also
rejected by Dr. Kessler who also contradicts herself in denying Ms. Plaintiff's
requested accommodation:

> Hello Katie, from what you sent me, an incomplete states: An
> incomplete grade may be used at the instructor's discretion to
> indicate that additional work is necessary to complete a course.

> An example situation where an incomplete would be an option is
> someone who got into a car wreck on the way to the final exam. They
> missed the exam because of it and were not capable of returning prior
> to the university's grade submission deadline.   An "I" would be
> recorded. As soon as the student was released from their physician,
> they would take the examination and then the transcript would be
> updated with their course grade.

> An incomplete does not apply to your situation as there is no
> additional coursework to be done, all of it was completed. Please let
> me know if you have additional questions.

54.    First, Ms. Plaintiff's disability related issue that prevented her from
completing her exam triggers considerations and obligations under the ADA/Section

16

Exhibit 2

504 whereas missing a final exam because of a car wreck does not. Second, Dr. Kessler claims Plaintiff's situation is different because "there is no additional coursework to be done, all of it was completed." This is not accurate - Ms. Plaintiff was unable to complete her coursework due to a panic attack stemming from her disability. As such, I fail to see how Dr. Kessler's provided example is not **exactly** the same situation as her hypothetical car wreck scenario.

55.    What Dr. Kessler is seemingly doing is sidestepping the issue and the fact the Ms. Plaintiff meets the criteria to receive an "I" under the school's policy. Dr. Kessler continually provides excuses why she is denying Plaintiff's request. However, those excuses are based on faulty misunderstandings of Plaintiff's situation as well as school policy.

56.    That the school is penalizing Plaintiff on the basis of a disability with suspension and injunctive relief should issue including: that the school should restore her academic status to good standing by rescinding the adverse suspension and action; that the withdrawals from Fall 2017 be treated as non-penalty withdrawals on the basis of medical necessity; that Plaintiff be allowed to either retake the final examination in with appropriate accommodations, that she failed due to panic attacks and/or lacking accommodations; that she be given an "incomplete" for this course, and be allowed to retake the final examination; or that she be withdrawn from this course without penalty and/or based on medical necessity; and that the DSS office, or other appropriate administrator, meet with Ms. Plaintiff to design and implement a plan of accommodations and/ or academic adjustments for

17

**Exhibit 2**

the duration of her attendance with the pharmacy school that includes counseling, if advised by an appropriate doctor, and that she not be forced to take a leave of absence or otherwise be penalized with academic suspension.

## COUNT I - SECTION 504 OF THE REHABILITATION ACT

57.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs. Additionally, Plaintiff alleges:

58.    Section 504 of the Rehabilitation Act of 1973 provides in pertinent part:

[N]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance ....

29 U.S.C. § 794.

59.    Plaintiff is at all times relevant herein a qualified individual with a disability within the meaning of the Rehabilitation Act because she has impairments that substantially limits one or more of their major life activities. 29 U.S.C. 26 § 705(20) (B) as set forth above.

60.    Plaintiff is otherwise qualified to participate in the services, programs, or activities of SWOSU. 29 U.S.C. § 794 (b).

61.    At all times relevant to this action Defendants were recipients of federal funding within the meaning of the Rehabilitation Act. As recipients of federal funds, they are required to reasonably accommodate inmates with disabilities in their facilities, program activities, and services. It further requires the Defendant to modify their facilities, services, and programs as necessary to accomplish this purpose.

**Exhibit 2**

62.    Through their acts and omissions described herein, Defendants have violated the Rehabilitation Act by excluding Plaintiffs from participation in, denying Plaintiffs the benefits of, and subjecting Plaintiffs to discrimination in the benefits and services.  Plaintiff was retaliated against in violation of § 504 as set forth above.

63.    Plaintiff requested a reasonable accommodation and SWOSU wholly failed to comply.  Defendants provides to the detainees and inmates without disabilities.

64.    As a direct and proximate result of the aforementioned acts, Plaintiff's suffered and continue to suffer humiliation, hardship, anxiety as well as financial damages due to SWOSU failures to address accommodations and modifications requested by plaintiff.

65.    Because Defendants' discriminatory conduct is ongoing, declaratory and injunctive reliefs are appropriate remedies. Moreover, as a result of Defendant's' actions Plaintiff is suffering irreparable harm, and thus immediate relief is appropriate.

66.    Pursuant to 29 U.S.C. § 794(a) Plaintiffs are entitled to declaratory and injunctive relief and to recover from Defendants the reasonable attorneys' fees and costs 4 incurred in bringing this action.

## COUNT II - BREACH OF CONTRACT

67.    Plaintiff incorporates by reference the foregoing.   Additionally, plaintiff asserts:

68.    Plaintiff had a contract with Defendant by virtue of the student handbook, which provides:

ACADEMIC APPEALS PROCEDURE

19

**Exhibit 2**

1.   The student must exhaust all appeal requirements of the academic department from which the appeal is made before the student may file an appeal with the Academic Appeals Committee. Any appeal made by a student to the committee will be denied by the committee if the student has not exhausted all departmental appeal procedures.

2.   With the exception of a Request to Change a Grade to a Withdrawal (W), the student must exhaust the following university administrative remedies before filing a written Application for Academic Appeal of a course grade unless they are included in the departmental appeals procedure: • The student must discuss the issue with the course instructor. If the issue is not resolved to the satisfaction of the student, the student must proceed to the next step. • The student must discuss the issue with the chair of the appropriate department. If the instructor assigning the grade has left the university before the start of the appeal, the department chairperson shall represent the instructor in the appeal process. If the chair of the department is directly involved in the matter, or if the issue is not resolved to the satisfaction of the student, the student must proceed to the next step. • The student must discuss the issue with the associate dean/dean of the school in which the course is taught. If the dean is directly involved in the matter, or if the issue is not resolved to the satisfaction of the student, the student may file a written Application for Academic Appeal. The policy in its entirety may be found online in the Academic Appeals Procedure.

(www.swosu.edu/students/fpp.aspx)

Further, plaintiff is directed to fill out an APPLICATION FOR ACADEMIC APPEAL as well as an academic appeal policy which is attached hereto as Exhibit 1 and incorporated. Numerous other documents reference the academic policy and the pharmacy school explicitly provides that the SWOSU undergraduate policy applies to SWOSU pharmacy students.

69.   That these documents and assurances created a reasonable expectations and contract.

**Exhibit 2**

70.   Defendant beached contract by failing to comply, failing to even provide a
hearing to plaintiff.

71.   Plaintiff seeks damages in excess of $ 10,000.00.

### **COUNT III - OKLAHOMA CONSUMER PROTECTION ACT**

72.   Plaintiff incorporates by reference the foregoing.   Additionally, plaintiff
asserts:

73.   Plaintiff entered into a consumer transaction with the University as that
term is defined by the Oklahoma Consumer Protection Act, 15 O.S. §751 _et seq._
(OCPA).

74.   The University engaged in numerous acts of unfair trade practices as
those terms are defined by the OCPA.

75.   The University engaged in numerous deceptive trade practices under the
OCPA.

76.   That whether the OCPA applies to educational institutions is undecided
under Oklahoma law; however numerous other jurisdictions with similar consumer
protection laws have held that such laws apply to educational institutions. _See e.g.,_
_Scott v. Association for Childbirth at Home Int'l,_ 430 N.E. 2d 1012, 1015-1017 (Ill.
1982) (holding that state unfair and deceptive practices act applies to purchase of
educational services); _Alsides v. Brown Institute;_ 592 N.W. 2d 468 (Minn. Ct. App.
1999); _Day v. Yale Univ. Sch. of Drama,_ No. CV 970400876S, 2000 WL 295612, at *4

21

**Exhibit 2**

(finding plaintiff sufficiently alleged trade or commerce by alleging that school failed to inform him his likelihood of dismissal early enough for him to decide whether to continue his course of study and accrue further expenses). Accordingly, like other states similar statutes, this Court should expressly determine that the OCPA applies to Plaintiff under applicable law.

## COUNT IV - 42 U.S.C. § 1983 - DUE PROCESS – AS TO THE INDIVIDUAL DEFENDANTS

77.    Plaintiff incorporates by reference the foregoing.   Additionally, plaintiff asserts:

78.    Plaintiff had a property interest in her continued education.

79.    Defendants violated plaintiff's due process by failing to advise her that she was in danger of suspension.

80.    The defendants made their decisions regarding plaintiff were not careful and constitutes deliberate indifference and theses decisions were arbitrary.

81.    As a result of the conduct of Defendants, damages should issue; specifically, Plaintiff has sustained actual damages in excess of $75,000.00.

82.    Defendants have acted with conscious disregard for federally secured rights of Plaintiff and as such punitive damages should be assessed and awarded.

WHEREFORE, Plaintiff requests an award of actual damages in excess of $10,000.00 against all Defendants, the costs of this action, pre and post judgment

22

**Exhibit 2**

interest, reasonable attorney fees and costs, and any other and further relief that this

Court deems proper.

_B. McHugh_

Brendan M. McHugh, OBA #18422
Attorney for Plaintiff
P.O. Box 1392
Claremore, OK 74018
Tele: (918) 608-0111
Fax: (918) 803-4910
and
Dana Jim, OBA #19495
P.O. Box 1011
Vinita, OK  74301
Tele:  918-457-6626
Fax: 918-517-3431
Co-Counsel for Plaintiff


**JURY TRIAL DEMANDED**

**ATTORNEY LIEN CLAIMED**

**Exhibit 2**